**Juan R. ESTEÑOS, Appellant,**

v.

**PAHO/WHO FEDERAL CREDIT UNION, Appellee.**

**PAHO/WHO Federal Credit Union, Cross–Appellant,**

v.

**Juan R. Esteños, Cross–Appellee.**

Nos. 04–CV–1093, 04–CV–1679.

District of Columbia Court of Appeals.

Argued Sept. 13, 2005.

Decided July 3, 2008.

James E. Rubin, with whom Mindy G. Farber was on the brief, Rockville, MD, for appellant.

F. Joseph Nealon, Washington, with whom Jeffrey W. Larroca and Kirsten E. Keating were on the brief, for appellee.

Emmett B. Lewis and Victor Tabak, Washington, appear on the brief for Washington Lawyers' Committee, as amicus curiae on behalf of appellant.

Before RUIZ, Associate Judge, and STEADMAN and SCHWELB,* Senior Judges.

RUIZ, Associate Judge:

Juan Esteños, in alleging discrimination against his former employer, presents an issue of first impression: does the District of Columbia Human Rights Act, D.C.Code § 2-1401.01 *et seq.* (2001) ("DCHRA"), allow an employee to initially raise a claim of national origin discrimination on evidence of an English proficiency requirement? We hold that it does. We also hold that timely filing a claim with the U.S. Equal Employment Opportunity Commis-

sion ("EEOC"), which in turn cross-files with DCHRA, tolls the time for filing a private cause of action under D.C. law. Accordingly, we reverse the trial court's grant of summary judgment for appellee and remand the case for further proceedings.

## I. Background

Before immigrating to the United States, Juan Esteños was an auditor and accountant in his native Perú. While he initially sought similar work in this country, he instead settled for a position as an office clerk at PAHO/WHO–FCU, the employee credit union for the UN-affiliated Pan–American Health Organization and World Health Organization. At the time, Mr. Esteños had only completed a basic class in English, and his grasp of the language was rudimentary. According to Mr. Esteños, his job interview, in January 2000, was conducted entirely in Spanish by the general manager (then-CEO Carla Decker), the manager of operations (Pablo Hernandez) and the finance manager (unidentified), who are bilingual. Although appellant testified that Ms. Decker told him that in order to progress to a more advanced position he "should continue studying English," she, who did not remember having interviewed Mr. Esteños, also did "not recall any specific conversations with Mr. Esteños regarding his ability to speak English or Spanish."

The parties dispute whether the office clerk position required English proficiency at the time Mr. Esteños was hired. With its motion for summary judgment, PAHO/WHO–FCU submitted a document labeled, "Job Description—Office Clerk," which names Mr. Esteños as the office clerk, yet lists the following requirements: "High

---

* Judge Schwelb was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on June 24, 2006.

School diploma. Banking experience desired. *Very good knowledge of English and Spanish.*" (emphasis added). Appellant contends that since it is undisputed that he did not have a "very good knowledge of English" at the time he was hired, the language requirement it identifies was either ignored or added only after he was hired. PAHO/WHO–FCU cites Carla Decker's deposition testimony as proof that the requirement pre-dated appellant's hiring. In her deposition, Ms. Decker acknowledges the requirement for English fluency in the position description, but in describing the duties of the office clerk, mentioned only two tasks that could require English reading comprehension— reading notes that came with checks deposited with the credit union or messages that were added to customers' accounts. She also testified that, as office clerk, Mr. Esteños did not have to deal with the CEO verbally (in her words, "to no extent"), and that Mr. Esteños communicated with his coworkers in Spanish. As concerns his knowledge of English, Ms. Decker testified that she had "spoken to [appellant] in English" at staff meetings.

In April 2000, after a probationary period, appellant received a positive evaluation from his immediate supervisor, Pablo Hernandez, the Member Services Manager. According to the evaluation, appellant's performance was "highly regarded," and appellant was an "eager learner" whose "accomplishments ... [were] noteworthy." The evaluation concluded with the expectation that appellant's knowledge of the credit union's products would be "develop[ed]" and that his work responsibilities would be increased. There was no mention of his lack of English proficiency or of any resulting deleterious impact on his ability to perform his assigned work. As a result of having successfully completed the probationary period, appellant received a salary increase. That happy state of affairs did not last long, however.

In August 2000, Leonard Supchak, who had been the credit union's CEO some years before Ms. Decker assumed the role, again became CEO. Later that month, Mr. Supchak, who does not speak Spanish, terminated Mr. Esteños "due to [his] inability to fulfill the requirements of the position." The termination letter explained that, "[t]he job requires fluency in both English and Spanish. [Appellant's] lack of fluency in English makes it impossible for [appellant] to fulfill the requirements of the position." According to appellant, Mr. Supchak told him verbally that he was being terminated because Mr. Supchak "did not understand" appellant's limited English. Mr. Esteños was not replaced; instead his duties were distributed among other staff members.

Although the record does not indicate the language proficiency of every member of the staff of PAHO/WHO–FCU, several who are identified are listed as being Spanish–English bilingual, and Ms. Decker testified that the credit union's goal was to have everybody on staff be bilingual, presumably to accommodate the credit union's customers, many of whom are Hispanic and may prefer to conduct their personal financial transactions in Spanish. PAHO/WHO–FCU asserts that every employee can speak at least English, and Mr. Supchak and Marites R. Alfaro both speak only English. Ms. Alfaro was the first of eight new employees hired by Mr. Supchak in 2000, over one half of the staff of PAHO/WHO–FCU. Of those hired, at least two are bilingual, the rest unknown; two are identified as Peruvian.[1]

1. All the remainder were also born outside the United States: four elsewhere in Latin America, one in Iran and one in the Phillippines. It also appears that Mr. Supchak had

Mr. Esteños filed a complaint with the EEOC on September 7, 2000, claiming that his firing was discriminatory, based on national origin, "because of [his] lack of fluency in English." On September 14, 2000, the EEOC gave notice of the claim to PAHO/WHO–FCU and to the D.C. Office of Human Rights ("DC OHR"). PAHO/WHO–FCU confirmed that the reason it fired Mr. Esteños was his lack of English proficiency, adding that "[t]his deficiency ma[kes] it impossible for Mr. Este[ñ]os to communicate with our members and to understand and communicate with some staff members." The following year, after an investigation, the EEOC found "reasonable cause to believe" that PAHO/WHO–FCU violated Title VII, by discriminating on the basis of national origin due to Mr. Esteños's inability to speak English. It also found the employer's proffered reason to be "pretextual" because it had not similarly fired another employee (Ms. Alfaro) who spoke only English and had trouble communicating with some of the credit union's Spanish-speaking customers. PAHO/WHO–FCU disputed the EEOC's determination, citing Mr. Supchak's record of hiring Peruvians, and the necessity that he be able to communicate with the office clerk, without having to resort to other staff as interpreters. Because the EEOC "could not obtain a settlement," on September 14, 2001, it advised appellant of his right to sue, stating again that it found "reasonable cause to believe that violations of [Title VII] occurred with respect to some or all of the matters alleged in the charge." Although the EEOC announced that it did not intend to sue the employer "at this time," it reserved the right to sue the employer at a later time or to intervene in a lawsuit filed by Mr. Esteños. Three months later, on December 14, 2001, appellant filed his complaint in D.C. Superior Court, essentially tracking (and referencing) the findings of the EEOC.[2]

The trial court denied appellee's motion to dismiss the action as time-barred by the one-year statute of limitations, reasoning "that the EEOC cross-filing [with D.C. OHR] satisfies both the intent and language of" the DCHRA statute of limitations.

After having previously denied appellee's motion for summary judgment as premature, the trial court reheard the motion after discovery was completed, and granted summary judgment on two grounds. First, although the trial court recognized that a person's foreign accent or ability to speak a foreign language could form the basis for a charge of national origin discrimination, it was of the view that the DCHRA does not also protect those who lack the ability to speak English proficiently.[3] In any event, the trial court held, "plaintiff cannot establish the fourth element of a prima facie case, which requires that a similarly situated employee be

hired another Peruvian during his prior tenure as CEO.

2. Appellant's complaint originally alleged violations of both Title VII and the District of Columbia Human Rights Act. PAHO/WHO–FCU removed the lawsuit to the U.S. District Court for the District of Columbia, and promptly moved to have the Federal count dismissed as a matter of law. United States District Judge Colleen Kollar–Kotelly dismissed the Federal claim on the ground that Title VII does not cover organizations, such as PAHO/WHO–FCU, with less than 15 employees. She then remanded the District of Columbia Human Rights Act count to the Superior Court, as a matter of local competence. Neither party appealed Judge Kollar–Kotelly's order. The DCHRA contains no requirement regarding the minimum number of employees.

3. The trial court ruled that "plaintiff's alleged national origin sub-class, 'Peruvian immigrants who have not yet become proficient in English' is not supported under the DCHRA."

treated more favorably." Therefore, the trial court granted summary judgment to appellee because appellant was not entitled to relief as a matter of law. In this appeal, Mr. Esteños challenges both prongs of the summary judgment ruling; PAHO/WHO–FCU cross-appeals the trial court's denial of its motion to dismiss under the statute of limitations.

## II. Statute of Limitations

■ Unsuccessful motions to dismiss, such as the denial of the motion to dismiss under the statute of limitations raised in appellee's cross-appeal, are reviewed *de novo*, viewing all facts in the light most favorable to the non-moving party. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 730 (D.C.2000); *Johnson–El v. District of Columbia*, 579 A.2d 163, 166 (D.C.1990).

The relevant time-line for statute of limitation purposes is as follows: Mr. Esteños was fired on August 31, 2000; he filed a complaint with the EEOC on September 7, 2000; EEOC informed PAHO/WHO–FCU and the DC OHR on September 14, 2000; EEOC completed its investigation and sent a Right to Sue letter to Mr. Esteños on September 14, 2001; Mr. Esteños filed suit on December 14, 2001.

■ The DCHRA provides for filing with the DC OHR as follows:

*Any* person or *organization, whether or not an aggrieved party, may file with the Office a complaint of a violation* of the provisions of this chapter.... Any complaint under this chapter shall be filed with the Office *within 1 year* of the occurrence of the unlawful discriminatory practice, or the discovery thereof, except as may be modified in accordance with § 2–1403.03 [referring to suits against the DC government].

D.C.Code § 2–1403.04(a) (2001) (emphasis added). The DCHRA also provides for filing of private actions in court:

Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder; provided, that where the Office has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed. No person who maintains, in a court of competent jurisdiction, any action based upon an act which would be an unlawful discriminatory practice under this chapter may file the same complaint with the Office. A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within *one year* of the unlawful discriminatory act, or the discovery thereof.... *The timely filing of a complaint with the Office*, or under the administrative procedures established by the Mayor pursuant to § 2–1403.03, *shall toll the running of the statute of limitations while the complaint is pending.*

D.C.Code § 2–1403.16(a) (2001) (emphasis added). The trial court ruled that the EEOC's "cross-filing [with the DC OHR] essentially satisfied the requirements of a complaint [with the DC OHR]." Appellee argues, as it did in the trial court, that plaintiff did not actually file a complaint with the DC OHR, but this is not determinative, for as the trial court correctly ruled, a plaintiff does not need to file *personally* with the OHR to satisfy the statute's tolling requirement. The DC OHR's and EEOC's procedural requirements are to be read broadly and flexibly in the employee's favor in light of their

remedial purposes and because they are designed for lay persons. *See, e.g., EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 115–16, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988) (providing benefit of full limitations period to claimant who filed directly with EEOC where federal and state agencies had a work-sharing arrangement); *Love v. Pullman Co.,* 404 U.S. 522, 525–27, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) (Colorado Civil Rights Commission may waive rights in favor of EEOC); *Ivey v. District of Columbia,* 949 A.2d 607, 612 (D.C.2008) (applying *Commercial Office Prods. Co.* to work-sharing agreement between EEOC and DC OHR); *Fowler v. District of Columbia,* 122 F.Supp.2d. 37, 42–43 (D.D.C. 2000) (DC OHR/EEOC cooperation agreement is designed to avoid double-filing and should be respected). Under such a broad reading of the statute's filing requirement, appellant's timely filing with the EEOC, of which DC OHR promptly received a copy under the existing agreement between the federal and local agencies, sufficed to toll the limitations period for filing in court. Moreover, even under a literal reading of the DCHRA, "*any* person or *organization, whether or not an aggrieved party, may file with the Office,*" D.C.Code § 2–1403.04(a) (emphasis added), and "[t]he timely filing of *a* complaint . . . shall toll the running of the statute of limitations." D.C.Code § 2–1403.16(a) (emphasis added). As the EEOC qualifies as "any" organization, its timely cross-referral of ap-

pellant's EEOC claim to DC OHR tolled the running of the one-year statute of limitations. We, therefore, conclude that the trial court properly denied appellee's motion to dismiss the complaint as time-barred.[4]

## III. Claim of National Origin Discrimination

### A. Title VII and DCHRA

■ We follow cases construing Title VII in interpreting and applying the provisions of the DCHRA "when appropriate," that is, to the extent that the acts use similar words and reflect a similar purpose. *Benefits Commc'n Corp. v. Klieforth,* 642 A.2d 1299, 1301 (D.C.1994); *see, e.g., Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 887 (D.C.2003) (en banc); *cf.* 4 DCMR § 500.2 (1995) ("In general, the Office and the Commission adopt and incorporate by reference current regulations of the U.S. Equal Employment Opportunity Commission and shall follow general principles of Title VII of the Civil Rights Act of 1964, as amended, wherever applicable in interpreting the D.C. Human Rights Act of 1977 . . . unless specific guidelines state the contrary.") Our reliance on federal cases construing Title VII, while generally apt, must be mindful of differences between the federal and D.C. laws, however, which can be significant. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom,*

---

4. We are unpersuaded by PAHO/WHO–FCU's reliance on *Griffin v. Acacia Group,* No. 97–2816, 1998 U.S. Dist. LEXIS 10854 at *12–13 (D.D.C.1998), for the proposition that since "DC OHR did not assume jurisdiction in this case . . . DC OHR never had plaintiff's case, and there never was any action 'pending *before*' the DC OHR, which would allow tolling." (emphasis added) (quoting 44 D.C.Reg. 4857)(1997); D.C.Code § 1–2556 (1997 Supp.). Even if we were to consider the U.S. District Court's unpublished opinion, it is based on different statutory language that was

not in effect at the time Mr. Esteños filed his claim with the EEOC and complaint in the Superior Court. In 1998, when *Griffin* was decided, D.C. law provided that the statute of limitations for filing in court would be tolled "while the complaint is pending *before the [D.C.] Office.*" D.C.Code § 1–2556 (1980) (emphasis added). That is no longer the case. The Human Rights Amendment Act eliminated the requirement that the claim be pending "before the Office." *See* D.C. Law 14–189, § 2(i) (Oct. 1, 2002); D.C.Code § 2–1403.16(a).

715 A.2d 873, 889 (D.C.1998); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 371–72 (D.C.1993) (permitting, given language of DCHRA and legislative history, punitive damages not available under Title VII).

■ An overriding difference is that in enacting the DCHRA, the Council of the District of Columbia intended to go above and beyond the protections afforded to employees by Title VII. The DCHRA not only enumerates more protected classes than Title VII, *compare* D.C.Code § 2–1402.11, *with* Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e–2 (a) (2003), but also announces, "the intent of the Council of the District of Columbia, in enacting this chapter, [is] to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to," the enumerated classes. D.C.Code § 2–1401.01. That does not mean, however, that this court will create new protected classes not identified by the legislature. *See Sorrells v. Garfinckel's,* 565 A.2d 285, 289 (D.C.1989) (rejecting extension of DCHRA where employee failed to claim a protected-class membership). But it does mean that we must read the words of the DCHRA liberally consistent with the Act's sweeping statement of intent. *See George Washington Univ. v. D.C. Bd. of Zoning Adjustment,* 831 A.2d 921, 939 (D.C.2003) ("The Human Rights Act is a broad remedial statute and it is to be generously construed."). As we explain *infra,* in this case the claimed basis of discrimination, national origin, appears in both Title VII and the DCHRA, and D.C. regulations expressly adopt federal regulations concerning English-proficiency requirements as

possible evidence of national origin discrimination.

We have held that under the "Effects Clause" of the DCHRA, D.C.Code § 2–1402.68,[5] "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 29 (D.C.1987) (en banc) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) (finding that "none of the Human Rights Act's narrowly-drawn exceptions," such as the " 'business necessity exception' in cases of unintentional discrimination," applied to excuse discrimination based on group's sexual orientation). The DCHRA's "Effects Clause" has no parallel in the language of Title VII, and was modeled on the Supreme Court's opinion in *Griggs v. Duke Power Co.* So in this respect, as well, the statutory language of the DCHRA is broader in scope than that of Title VII (although not as it has been interpreted by the Court to prohibit practices that have a disparate impact).

■ Yet another difference derives from how federal and District of Columbia law accommodate to the defense of business judgment in evaluating whether a requirement or practice that has an adverse impact on a protected class—which would otherwise be actionable as impermissible discrimination—is nonetheless justified by a "neutral," independent, and non-discriminatory reason. Under Title VII, "it shall not be an unlawful employment practice for an employer to hire and employ, employees ..., on the basis of ... national origin in those certain instances

---

5. "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlaw-

ful discriminatory practice." D.C.Code § 2–1402.68.

where ... national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise." 42 U.S.C. § 2000c–2 (emphasis added). Applying Title VII [with respect to claims of national origin discrimination], federal courts have held that "an English-only rule ... does not violate Title VII as applied to bilingual employees so long as there is a *legitimate* business purpose." *Prado v. L. Luria & Son Inc.,* 975 F.Supp. 1349, 1354 (S.D.Fla. 1997) (emphasis added). The DCHRA, however, does not contain an exception that explicitly permits outright discrimination on the basis of national origin in employment.[6] Instead, it statutorily limits justifying *unintentional* discrimination to "business necessity," which is narrowly defined:

> Any practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity. Under this chapter, a "business necessity" exception is applicable only in each individual case where it can be proved by a respondent that, without such exception, such business cannot be conducted; a "business necessity" exception cannot be justified by the facts of increased cost to business, business efficiency, the comparative characteristics of one group as opposed to another, the stereotyped characterization of one group as opposed to another, and the preferences of co-workers, employers, customers or any other person.

D.C.Code § 2–1401.03(a) (2001). This exception, we have said, requires "a good deal more than a mere difficulty in conducting a business by non-discriminatory means." *Natural Motion by Sandra v. D.C. Comm'n on Human Rights,* 687 A.2d 215, 218 (D.C.1997) (citation omitted) (upholding D.C. Commission on Human Rights finding that "occasional absences" due to employee's physical handicap— AIDS—that "caused 'an unspecified increase in inefficiency in the operation of [a] salon'" is insufficient to meet business necessity exception). The DCHRA places the burden of proving the exception of "business necessity" squarely on the employer, who must meet that burden "in each individual case." D.C.Code § 2–1401.03. Moreover, the business necessity exception should be "interpreted narrowly and with the greatest of caution." COMMITTEE ON EDUCATION AND YOUTH AFFAIRS REPORT ON TITLE 34, THE HUMAN RIGHTS LAW, at 4, Oct. 15, 1973 (tracing the origin of the exception for "business necessity" to *Griggs v. Duke Power Co.* and disavowing subsequent cases "obscur[ing]" the meaning of the exception as well as certain practices permitted by the EEOC guidelines such as, for example, "the preferences of co-workers, employers, customers or any other person(s)"). Thus, we have held that the business necessity exception "could not be invoked to insulate [a company] from the bias or 'preferences of co-workers [and] employees'" where the company's contractor refused to provide plumbing services to a person with AIDS. *Joel Truitt Mgmt., Inc. v. D.C. Comm'n on Human Rights,* 646 A.2d 1007, 1009 (D.C. 1994) (per curiam) (quoting D.C.Code § 2–1401.03). As we review Title VII caselaw, therefore, we do so with the understanding

---

**6.** The DCHRA contains only two exceptions— in addition to "business necessity"—for employment discrimination, for "bona fide" seniority systems or benefit plans, and mini-mum and maximum age limits for the police officer and firefighter cadet programs. *See* D.C.Code § 2–1402.12.

that practices that are merely questionable under Title VII may suffice to establish discrimination under the DCHRA. *Compare Prado,* 975 F.Supp. at 1354 (finding legitimate business purpose of English-only rule where manager testified customers preferred not to overhear Spanish), *with* D.C.Code § 2–1401.03 (excluding "preferences of co-workers, employees, customers or any other person" as justification for "business necessity").

### B. The McDonnell Douglas Test

 "In an employment discrimination case ..., this court has adopted the Supreme Court's approach with respect to the allocation of the burdens of proof under Title VII...." *Atlantic Richfield Co. v. D.C. Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986). For cases alleging disparate treatment [7] based on an impermissible discriminatory ground, the Supreme Court established a burden-shifting analytical framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): [8]

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of ... discrimination. This may be done by showing (i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii)

that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

 The complainant's burden of establishing a *prima facie* case of discrimination is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the complainant makes a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. Finally, the employee may rebut the employer's non-discriminatory reason as pretextual and endeavor to meet his ultimate burden of showing impermissible discrimination. *See id.* at 804, 93 S.Ct. 1817; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The test, of course, should be modified to the facts at hand, which involve a termination, not a failure to hire, and the proper inquiry is whether "termination was based on the characteristic that placed [claimant] in the protected class," *McManus v. MCI Commc'ns Corp.,* 748 A.2d 949, 954 (D.C. 2000). Whenever the employer did not seek to or did not actually replace the

---

**7.** A different conceptual basis for establishing discrimination is the doctrine of disparate impact, embodied in the DCHRA's Effects Clause, discussed *supra,* which analyzes the effect of facially neutral practices on a particular protected group. *See* D.C.Code § 2–1402.68, note 5, *supra; Griggs,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; *Gay Rights Coalition,* 536 A.2d at 29.

**8.** It is understood that the *McDonnell Douglas* test is a means to establish discrimination inferentially by circumstantial evidence. If the employee offers direct rather than circumstantial evidence of discrimination, then the

*Price Waterhouse* "mixed motives" test is applied. To make a *prima facie* case of discrimination, a plaintiff need only provide evidence that a decision-maker possesses a prejudice or bias, and then prove to the factfinder that "that attitude was more likely than not a motivating factor in the employer's decision to terminate." *Hollins v. Fed. Nat'l Mortgage Ass'n,* 760 A.2d 563, 574–75 (D.C.2000) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). In such a case, the "similarly situated" test of *McDonnell Douglas* is irrelevant.

claimant with another employee, as here, we have modified the fourth factor of the *prima facie* case to require that the claimant show that a "similarly situated" person outside of his protected class "w[as] not terminated but w[as] instead treated more favorably." *Id.* That person, appellant has claimed in the trial court and on appeal, was Ms. Alfaro, who is from the Phillippines, and was not fired notwithstanding that her inability to speak Spanish caused difficulties in her communications with some of the credit union's customers.

## C. Title VII Regulations and Caselaw

Language-proficiency requirements can be based on perfectly legitimate considerations, but they are also capable of use to discriminate against nationals of countries where the language is not generally spoken. In regulations issued to implement the prohibition against employment discrimination based on national origin, the EEOC "defines national origin discrimination broadly, as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1(2008). The EEOC regulations establish that "[t]he title VII principles of disparate treatment and adverse impact equally apply to national origin discrimination." *Id.* at § 1606.2.[9] With respect to the "linguistic characteristics" of persons of a national origin group, the EEOC has identified "fluency-in-English" [10] and "English-only" [11] requirements for employment as possibly discriminatory and, thus, it will "carefully investigate charges involving these selection procedures for both disparate treatment and adverse impact on the basis of national origin." *Id.* at § 1606.6(b)(1).[12]

---

**9.** For that reason, for example, height and weight requirements, "which tend to exclude individuals on the basis of national origin" must be evaluated for adverse impact by employers "regardless of whether the total selection process has an adverse impact based on national origin." 29 C.F.R. at § 1606.6(a)(2).

**10.** "Fluency–in–English" requirements include denial of employment opportunities because of a person's foreign accent or "inability to communicate well in English." 29 C.F.R. § 1606.6(b)(1).

**11.** The EEOC regulations provide, with respect to the related but distinct "speak-English-only" job rules:

§ 1606.7 Speak–English–only rules.
(b) When applied only at certain times. An employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity.
(c) Notice of the rule. It is common for individuals whose primary language is not English to inadvertently change from speaking English to speaking their primary language. Therefore, if an employer believes it has a business necessity for a speak-English-only rule at certain times, the employer should inform its employees of the general circumstances when speaking only in English is required and of the consequences of violating the rule. If an employer fails to effectively notify its employees of the rule and makes an adverse employment decision against an individual based on a violation of the rule, the Commission will consider the employer's application of the rule as evidence of discrimination on the basis of national origin.
29 C.F.R § 1606.7.

**12.** Although such requirements are subject to scrutiny, they may not ultimately be grounds for discrimination under Title VII if justified under the "bottom line" concept. 29 C.F.R. § 1606.6(b). The "bottom line" concept is defined in terms of "adverse impact," which in turn refers to the "four fifths rule." *Id.* at § 1607.4 C–D. Height and weight requirements, on the other hand, are considered exceptions to the "bottom line" concept. *Id.* at § 1606.6(a)(2). We need not and do not consider in the context of deciding whether summary judgment was appropriate in this case, how (or whether) the "bottom line concept"

Federal courts recognize the potential discriminatory impact of certain linguistic requirements and, consequently, have found that Title VII offers employees protection against that kind of discrimination, understanding, for example, that "[a]ccent and national origin are obviously inextricably intertwined in many cases." *Fragante v. City & County of Honolulu*, 888 F.2d 591, 596 (9th Cir.1989).[13] Consistent with the EEOC's policy to "carefully investigate" fluency-in-English and English-only requirements, one federal appellate court has "encourage[d] a very searching look" in such cases because otherwise

[i]t would therefore be an easy refuge in this context for an employer unlawfully discriminating against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communications skills demanded by the job.

*Id.* Not surprisingly, the decided cases reveal that the determination of whether an employment action based on an employee's linguistic characteristic is discriminatory is highly fact-bound and, for that reason, unlikely to be resolved on summary judgment. For example, what on its face may appear a legitimate business requirement,

if improperly applied, could constitute unlawful national origin discrimination. In *Carino v. University of Oklahoma*, 750 F.2d 815, 819 (10th Cir.1984), the court held that the plaintiff's Filipino accent was not a valid reason to terminate employment as a dental laboratory supervisor. In *Fragante*, 888 F.2d at 596–98, on the other hand, the court held that Mr. Fragante's "pronounced Filipino accent ... interfered materially with job performance," which required the ability to communicate orally when interacting with the public at the Honolulu Division of Motor Vehicles and Licensing.[14]

## D. District of Columbia Law & Regulations

 The OHR and the District of Columbia Human Rights Commission have specifically adopted the above-quoted EEOC regulations dealing with national origin discrimination. *See* 4 DCMR § 511.1 ("The Office and Commission adopt and incorporate by reference the guidelines on National Origin Discrimination promulgated by the [EEOC], which appear in 29 C.F.R. § 1606"); *see also* 4 DCMR § 500.2 ("In general, the Office and the Commission adopt and incorporate by reference current regulations of the [EEOC] and shall follow general principles of Title VII ... wherever applicable ...

in the EEOC regulations meshes with the "business necessity" exception of the DCHRA, which is to be proven by the employer in "each individual case." D.C.Code § 2–1401.03(a).

13. We perceive some overlap between cases in which employees are fired because of their accent and those where there is a requirement of English fluency. In some sense, the significance between the two could be viewed as one of degree. As appellant points out, the basis for an English proficiency requirement is very different when applied to a law clerk and to a janitor who cleans the courthouse. In any event, the exact reason why Mr. Esteños was fired is unclear. Mr. Sup-

chak's letter mentioned his lack of proficiency in English, but Mr. Esteños testified that Mr. Supchak told him he could not understand his English, possibly a reference to Esteños's heavy Spanish accent.

14. Although in *Fragante* the court followed the EEOC's guidance and "carefully investigate[d]" employment requirements based on language, interestingly it disavowed deference to the EEOC's language rules, *see* 29 C.F.R. § 1606.6, as *not* constituting the EEOC's authoritative interpretation of the law, but due only "careful consideration." 888 F.2d at 597.

unless specific guidelines state the contrary"). Since the EEOC regulations have been incorporated into the District's regulatory law by the agencies charged with implementing the DCHRA, we owe them deference in interpreting the DCHRA. *See U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1096–97 (1997) (en banc). "[W]e defer to agency construction of statutes because of the agency's presumed expertise in construing the statute it administers.... We therefore have deferred ... for example ... to the Office of Human Rights when presented with different possible interpretations of the Human Rights Act...." *Id.* (citing *Timus v. D.C. Dep't of Human Rights*, 633 A.2d 751, 758–60 (D.C.1993) (en banc)).[15] We see no reason to reject the agency's broad interpretation as the inference of national origin discrimination flowing from linguistic characteristics recognized in the EEOC regulations adopted by the DC OHR is reasonable and finds statutory footing in the "Effects Clause" of the DCHRA. *See* D.C.Code § 2–1402.68, note 5, *supra.*

### E. Summary Judgment

■■■ This court reviews the grant of a motion for summary judgment *de novo*, *see Velasquez v. Essex Condo. Ass'n*, 759 A.2d 676, 679 (D.C.2000), under the same standard as the trial court: whether there are any material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. *See Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279,

1281 (D.C.2002). In considering a motion for summary judgment, all evidence and inferences from that evidence must be viewed in the light most favorable to the non-moving party. *See id.* The opposition, however, must consist of more than conclusory allegations, and be supported by affidavits or other competent evidence tending to prove disputed material issues of fact. *See Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198–99 (D.C. 1991). In a discrimination case, summary judgment is appropriate where the plaintiff fails to present a *prima facie* case or, even assuming a *prima facie* case, where there is no genuine issue of material fact "that the employer's non-discriminatory reason is pretextual." *Mitchell v. DCX, Inc.*, 274 F.Supp.2d 33, 39 (D.D.C.2003).

■■■ We disagree with the trial court's legal determination that appellant's claim based on lack of English proficiency has "no support" in the DCHRA. In light of the EEOC regulations recognizing a link between linguistic characteristics (such as the inability to speak English fluently) and national origin that have been incorporated into D.C. law, Mr. Esteños has initially presented a cognizable claim of national origin discrimination under the DCHRA, and satisfied the first prong of a *prima facie* case because appellee's English-proficiency requirement may be evidence of discrimination on the basis of his Peruvian national origin.[16] We also

**15.** The same deference is not necessarily owed to the EEOC's Compliance Manual. *See National Railroad Passenger Corp., v. Morgan*, 536 U.S. 101, 111 n. 6, 122 S.Ct. 2061, 153 L.Ed.2d 106 (U.S.2002) ("[T]he EEOC's interpretive guidelines do not receive Chevron[*v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)] deference," and are only useful in Title VII cases, "to the extent that those interpretations have the 'power to persuade.' " (citations omitted)); *see also Christensen v. Har-*

*ris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003) (all citing the lower-deference standard from *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

**16.** Thus, an issue is raised of possible discrimination on the basis of Mr. Esteños's status as a Peruvian, regardless of the existence *vel non* of a distinct protected "subclass" of non-En-

reject the trial court's determination that Mr. Esteños failed to meet the fourth prong of a *prima facie* case because he offered "no evidence that Ms. Alfaro's position demands the *same* duties and tasks as plaintiff's position as 'Office Clerk.'" (Emphasis added). But the fourth prong's comparison with another employee who is "similarly situated" cannot mean "identical" in a situation where the employee has not been replaced, as contemplated by *McManus. See* 748 A.2d at 955 n. 5 ("[A]ppellant ... [is] required to show that the jobs of one or more persons who were not members of the protected class, and who had jobs *similar* to hers had not been terminated." (emphasis added)). The point is that Mr. Esteños's proffered evidence that Ms. Alfaro was one of the persons who assumed some of his responsibilities and that, in any event, when she had difficulty communicating with the credit union's customers in Spanish—whatever the formal requirements of her job description—she was not fired as he was. This was enough on the particular facts presented here to defeat summary judgment on the ground that he had failed the "not onerous" burden of making out a *prima facie* case. Therefore, the trial court erred as a matter of law in dismissing the complaint on the ground that Mr. Esteños had not presented a *prima facie* case of discrimination under the DCHRA.

 Presentation of a *prima facie* case raises a presumption of discrimination, which shifts the burden of production to the employer to justify its action as the product of an independent non-discriminatory reason. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). On the record before us, it is undisputed that Mr. Esteños was fired on the stated ground that he did not meet PAHO/WHO–FCU's fluency-in-English requirement,[17] which the employer asserts is a non-discriminatory reason because English proficiency was "required" for the office clerk position.[18] What clearly remains in dispute, with conflicting evidence on both sides, as demonstrated by Mr. Esteños's opposition to the summary judgment motion, is, first, whether English proficiency was in fact a necessary requirement for this particular office clerk position, asserted by the employer as the reason for the termination, and, second, the level of Mr. Esteños's actual proficiency in English at that time. Appellee has asserted that "appellant's lack of fluency in English made it impossible for appellant to fulfill the requirements of the position," and that the English-proficiency requirement was applied in a non-discriminatory manner in light of appellant's actual command of English. But appellant has disputed both points, and these material facts that may bear on the issue of pretext are open to resolution by the fact finder. Although there may be certain situations where an employer's need to communicate with a subordinate

glish-speaking Peruvians, an issue relied on by the trial court but which we need not address on this appeal. See note 3, *supra.*

**17.** It could be argued that PAHO/WHO–FCU also enforced a speak-English-only rule that was "applied only at certain times," see note 11, *supra,* namely, when Mr. Supchak wanted to speak with the employee, but this basis was not asserted by appellant before the trial court.

**18.** According to the job description proffered by employer, a requirement of the office clerk position is "[v]ery good knowledge of English and Spanish." The termination letter sent to Mr. Esteños stated that "the job requires fluency in both English and Spanish." We address here the English proficiency issue solely in the precise context presented by the employer (*i.e.,* as indispensable to carry on the duties of the position).

employee may require that the latter literally be able to speak the supervisor's language, *see Garcia v. Gloor*, 618 F.2d 264, 271 (5th Cir.1980) (upholding English-only requirement so as to "provid[e] English speaking supervisors the ability to manage the enterprise by knowing what was said in the work area"), there is evidence disputing that such was the case here, given the favorable evaluation of Mr. Esteños's performance of his duties as office clerk and Ms. Decker's testimony that the CEO had no need to communicate verbally with the office clerk. Moreover, there is a dispute as to the extent to which Mr. Esteños's English (though concededly somewhat limited) was sufficient for his position, in light of Ms. Decker's testimony that she was, in fact, able to speak with Mr. Esteños in English during staff meetings. These disputed issues of material fact preclude the grant of summary judgment on the basis that the employer has proven a valid, non-discriminatory reason for terminating his employment. For example, in *Kyriazi v. Western Elec. Co.*, 461 F.Supp. 894 (D.N.J.1978), a sex discrimination case, the court dismissed as pretext the employer's allegations that Ms. Kyriazi was a "slow learner" with an "inability to communicate in English," pointing out that any immigrant who earns a graduate degree from Columbia University should be bright and articulate enough to communicate in a job that does not require a college degree. *See id.* at 925. Here, appellant, a trained accountant, was performing clerical duties, and the EEOC's Washington field office determined that appellee's proffered non-discriminatory reason was pretextual, making it inappropriate to decide that issue as a matter of law, rather than subject its credibility to assessment at trial by the finder of fact.

Moreover, appellant has argued that, even assuming that the English-proficiency requirement predated his hiring (or, alternatively, that the job's requirements changed once Mr. Supchak became CEO), he did not receive proper notice of the rule, having been told when he was hired only that he "should continue studying English" in order to progress to a more advanced position, but, "not ... that speaking English was a requirement for the office clerk job." In such a case, as there was no question that he otherwise satisfactorily performed as a clerk, appellant argues that appellee discriminated against him by not providing a transition period to permit him to improve his English proficiency or seek some interim alternative to facilitate his communications with Mr. Supchak.[19] In light of the material facts in dispute, summary judgment was improper. Although it is not necessary to our determination that Mr. Esteños has presented enough evidence of pretextuality to survive summary judgment, our conclusion is buttressed by the EEOC's determination, stated in the Right to Sue Letter, that it "found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charges."

We stress, however, that surviving summary judgment is far from establishing liability for discrimination under the DCHRA. Once appellant made a *prima facie* case and the employer presented a non-discriminatory reason, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappeared, and the sole remaining issue was discrimination *vel non*." *Reeves*, 530 U.S. at 142–43,

19. As noted, most of the credit union's employees are bilingual and probably could have provided any necessary interpretation, as they previously had done, if and when (itself a disputed issue of fact) the office clerk needed to communicate with the CEO.

120 S.Ct. 2097 (quotation marks and citations omitted). Because the trial court ruled that the DCHRA did not support a claim of national origin discrimination based on linguistic characteristics, the parties did not develop a factual basis from which the jury could determine whether the English proficiency requirement was, as claimed by appellee, required to perform the duties of the position appellant held, as in *Fragante, see also Dalmau v. Vicao Aerea Rio–Grandense*, S.A., 337 F.Supp.2d 1299 (S.D.Fla.2004) (upholding Brazilian airline's requirement that cargo sales representatives speak fluent Portuguese), or whether it was a pretextual requirement. The trial court did not focus to any significant degree on the import of appellee's actual national origin hiring practice. Since Mr. Supchak among other actions hired two Peruvians in the same year that he fired Mr. Esteños, PAHO/WHO–FCU argues that it has strong evidence that Mr. Supchak harbors no prejudice against Peruvians.

 In deciding that this case must be remanded, we rely particularly on the Supreme Court's decision in *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097, reversing a grant of judgment as a matter of law setting aside a jury verdict for the employee in an age discrimination case alleging disparate treatment. Applying the "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt,'" the Court held that a claimant's presentation of a *"prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 147–48, 120 S.Ct. 2097 (citation omitted). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Id.* at 153, 120 S.Ct. 2097; *see id.* at 147, 120 S.Ct. 2097 (explaining that "it is not enough ... to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination").[20] The Court emphasized the intense factual nature of the ultimate issue, so that:

[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors [ ] .... includ[ing] the strength of the plaintiff's

20. As already discussed, the DCHRA also offers protection against *un* intentional discrimination under the Effects Clause, in which case the employer may defend based only on the narrowly-drawn exceptions in the DCHRA, *see Gay Rights Coalition of Georgetown Univ. Law Ctr.*, 536 A.2d at 29. Under a disparate *impact* theory, the employer's good faith "does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Smith v. City of Jackson*, 544 U.S. 228, 234, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005) (quoting *Griggs*, 401 U.S. at 432, 91 S.Ct. 849). Although cases challenging language requirements have often been analyzed under a disparate impact theory, Mr. Esteños's claim was presented to the trial court as a case of disparate *treatment*, not disparate impact, and analyzed under the *McDonnell Douglas* framework. In determining the ultimate question of intentional discrimination in a disparate treatment case, a fact finder's conclusion that the position did not in fact require English proficiency beyond that of Mr. Esteños's does not necessarily preclude a jury determination that appellee's contrary view was one held in good faith. *See Fischbach v. D.C. Dep't of Corr.*, 318 U.S.App. D.C. 186, 189, 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Once the employer has articulated a nondiscriminatory explanation for its action, ... the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" (alterations in original)).

*prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148–49, 120 S.Ct. 2097. Based on the evidence that had been presented at trial, the Court held that the lower court had "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Id.* at 153, 120 S.Ct. 2097.[21]

Here, we are reviewing a grant of summary judgment before trial, and, unlike in *Reeves*, the parties have not had an opportunity to fully present their evidence and submit its credibility to the trier of fact. Assuming (as our colleague does) that the existence of other employees of appellant's same national origin in appellee's workforce could, as a matter of law, defeat a *prima facie* case of national origin discrimination where evidence of pretextuality has been presented, *but see* 29 C.F.R. § 1606.1 (defining national origin discrimination as the denial of equal opportunity "because of an individual's ... place of origin; *or* because an individual has the ... linguistic characteristics of a national origin group" (emphasis added)), on the authority of *Reeves* we are unwilling on this limited record and at this early point in the proceedings to rest an affirmance solely on this alternate ground. *See Reeves*, 530 U.S. at 153, 120 S.Ct. 2097 (noting that the fact that employer had hired "many managers over age of 50—although relevant, is *certainly not dispositive*" (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (emphasis added)); *id.* at 155, 120 S.Ct. 2097 (noting that "the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced" a *prima facie* case and evidence of pretextuality) (Ginsburg, J., concurring); *see also Dantley v. Howard Univ.*, 801 A.2d 962 (D.C.2002) (reversing summary judgment and remanding to trial court for further consideration relating to material fact in dispute)); *Cormier v. D.C. Water and Sewer Auth.*, 946 A.2d 340, 343 (D.C.2008) (same with respect to amount of damages).

The grant of summary judgment to appellee is reversed and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Senior Judge, concurring in part[1] and dissenting in part:

The principal issue in this case, as framed by the court, maj. op. at 882, is whether, under the DCHRA, a claim of employment discrimination based on national origin may properly be founded upon the employer's imposition of a requirement that its employees be proficient in English.[2] I do not doubt that there are

---

**21.** The Court considered that judgment as a matter of law would be appropriate if evidence of record "conclusively revealed some other, non-discriminatory reason for the employer's decision," or if the evidence of pretextuality was "weak ... and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. Neither situation obtains here. In this case, the *evidence* of pretextuality may be controverted, but it was not "weak," as the *employer's* records showed that Mr. Este-

ños had been performing his work in a satisfactory manner before Mr. Supchak's arrival.

**1.** I agree, substantially for the reasons stated in Part II of the court's opinion, that Esteños' action is not time-barred.

**2.** My separate opinion addresses only this issue. The majority does not base its decision on a "disparate impact" analysis, see maj. op. at 889 n. 7 and accompanying text, and I would vote to affirm under that test as well.

situations in which this question should be answered in the affirmative; inability to speak English may be a proxy for national origin discrimination where, *e.g.*, it is used to exclude Latinos and to keep a work force all-Anglo or predominantly Anglo. *See* 29 C.F.R. § 1606.6(b). In my opinion, however, no impartial trier of fact could reasonably find, on this record, and in light of the overwhelmingly Latino and non-Anglo composition of the credit union's work force and of its numerous Latino customers, that plaintiff Juan R. Esteños was discharged because of his Peruvian (or Latino) national origin. Accordingly, I would affirm the award of summary judgment in the employer's favor.

## I.

The DCHRA makes it unlawful, *inter alia*, to discharge a person "wholly or partially" for a discriminatory reason based upon "the race, color, religion, [or] *national origin* .... of any individual." D.C.Code § 2–1402.11 (2001). (Emphasis added.) "National origin" means "the state, country or nation in which a person or his or her ancestors were born." 4 DCMR § 599. The stated reason for Esteños' discharge was not his Peruvian or Latin–American national origin, but rather his lack of English fluency. It is undisputed that a Peruvian or other Latino who shares Esteños' national origin, but who is sufficiently fluent in English, is acceptable to the credit union. In fact, ten days before Esteños was fired, the credit union hired an Operations Manager who, like Esteños, was born in Peru. Conversely, the record provides no reason to doubt that a Caucasian individual of purely European national origin—French, Swedish, German, or Czech—would be ineligible for employment with the defendant (just as Esteños is) if he or she were not fluent in English. Inability to speak English adequately is thus decisive, regardless of the national origin of the complainant. According the language of the statute its plain and literal meaning, it is difficult to comprehend how Esteños' discharge could have violated the Act.

It appears from the record that when Esteños lost his job, the credit union was a very small office, with only nine employees. Esteños was discharged in August, 2000, and eight employees were hired between August 2 and November 14 of that year. The countries of birth of these eight employees were as follows:

Peru 2

Venezuela 1

Bolivia 1

Ecuador 1

El Salvador 1

Philippines 1

Iran 1

Thus, six of the eight employees were from Latin America, and none was European or Anglo. As previously noted, a Peruvian–American was hired as "operations manager" ten days before Esteños was discharged. Further, it appears to be undisputed that many of the credit union's customers are Latino and speak Spanish. Given this scenario, the "man on the Clapham bus"—the personification, in days gone by, of the reasonable person—would find startling indeed the suggestion that Esteños was fired because he comes from Peru. Facts are stubborn things, and the ethnic composition of the work force, as well as the surrounding circumstances, are far removed from the facts in most conventional cases of discrimination based on national origin.

Perhaps the illogic of the plaintiff's position can best be illustrated by following his theory to its logical conclusion. Suppose that *all* of the credit union's employees were of Peruvian national origin and that

all of them spoke excellent English. Suppose, further, that the person who fired Esteños was also from Peru. At least at the summary judgment stage, under the plaintiff's theory, apparently agreed to by the court, the predominance of Latino employees and the virtual absence of Anglos makes no difference. Therefore, Esteños could successfully claim, even in the all-Peruvian situation that I have hypothesized, that based on the perceived close connection between language proficiency and national origin, the reason for his discharge was his national origin. He could avoid summary judgment, under the majority's analysis, even though all of the other employees, as well as the person responsible for the challenged decision, were Peruvian–American. Surely, the law does not countenance such a counter-intuitive and (in my view) absurd result.

## II.

Although the majority appears to accord little, if any, weight to the tale told by the statistics described above, the case law pays them greater heed. " 'In the problem of racial discrimination,[3] statistics often tell much, and Courts listen.' " *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989) (quoting *State of Alabama v. United States,* 304 F.2d 583, 586 (5th Cir.), *aff'd,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962));[4] *Burns v. Thiokol Chemical Corp.,* 483 F.2d 300, 305 (5th Cir.1973). Further, in *Harris,* we applied the statistically-oriented analysis utilized by the federal appellate courts:

3. And, by analogy, discrimination based on national origin.

4. In *State of Alabama,* the court added that "[h]ere, [the statistics] are spectacular." 304 F.2d at 586. The same may fairly be said here.

Our wide experience with cases involving racial discrimination in education, employment, and other segments of society have led us to rely heavily in Title VII cases on the empirical data which show an employer's overall pattern of conduct in determining whether he has discriminated against particular individuals or a class as a whole.

*Id.* (quoting *Burns,* 483 F.2d at 305). So, too, in *Arrocha v. City Univ. of New York,* 2004 WL 594981 (E.D.N.Y.2004), in granting partial summary judgment in favor of the defendant against a Panamanian instructor's claim of discrimination based on national origin, the court held that

the record fails to reasonably support a finding of prohibited national origin discrimination. Although there is no evidence regarding the number of Panamanians employed by MEC, five of the eight adjunct instructors reappointed are natives of South or Central American countries, including Argentina, Peru, Mexico, and the Dominican Republic. Diversity in an employer's staff undercuts an inference of discriminatory intent.

(Citations omitted.)[5] The court's reasoning in *Arrocha* applies *a fortiori* to the even more compelling statistics in this case.

## III.

In reversing the award of summary judgment, the majority relies heavily on the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a case involving a claim of age

5. The court denied the University's motion for summary judgment with respect to the plaintiff's claims of discrimination based on color and on retaliation.

discrimination in employment. My colleagues cite *Reeves* for two separate propositions: (1) that discriminatory intent may often be properly inferred if the trier of fact finds the employer's explanation of the challenged action to be incredible; and (2) that the presence in the employer's work force of managers in the same age range as the plaintiff does not warrant the direction of a verdict in the employer's favor. The differences between *Reeves* and the present case, however, are striking. The Supreme Court's analysis in *Reeves* must be considered in the context of the compelling evidence of discriminatory animus which was present in that case, but which is completely absent from the present record.

In *Reeves*, the plaintiff, who was fifty-seven years old, and who had worked for the employer for forty years, was discharged from his position. He brought suit against the employer, alleging, *inter alia*, that his supervisor, who was the husband of the company's owner, told him that he was "so old [he] must have come over on the Mayflower" and that he was "too damn old to do [his] job." 530 U.S. at 151, 120 S.Ct. 2097. There was disputed testimony regarding whether Reeves had performed his job satisfactorily and whether his discharge was warranted.

The jury returned a verdict in Reeves' favor, but the United States Court of Appeals for the Fifth Circuit reversed, holding that although the jury could properly have found that the employer's explanation for its discharge of Reeves was pretextual, such proof was insufficient, even in conjunction with the evidence of age-based animus, to support a verdict in Reeves' favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 197 F.3d 688 (5th Cir.1999). The Supreme Court, however, reversed the decision of the Court of Appeals and reinstated the verdict and judgment. In

the course of its opinion, the Court recognized that "[p]roving the employer's [stated] reason [for discharging an employee] false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination." 530 U.S. at 147, 120 S.Ct. 2097. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* (citation omitted).

Significantly for the purposes of the present case, however, the Court made it clear that such a showing will not always be sufficient. On the contrary, it will be inadequate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue *and there was abundant and uncontroverted independent evidence that no discrimination had occurred."* *Id.* at 148, 120 S.Ct. 2097 (emphasis added). Further, if "the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent." *Id.* (internal citation and quotation marks omitted). The Court also stated that the fact the company employed many managers over the age of fifty, while relevant, "was not sufficient to *conclusively* demonstrate that [the employer's] actions were not discriminatorily motivated." *Id.* at 153, 120 S.Ct. 2097 (emphasis in original) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

IV.

In my opinion, the Supreme Court's decision in *Reeves* does not support reversal here. First, the case cannot readily be wrenched from its context, and, in particu-

lar, from the remarks of Reeves' boss that Reeves must have come over on the Mayflower and was "too damn old." With such evidence in the record, it is difficult to understand how the United States Court of Appeals, which was obliged to view the record in the light most favorable to the plaintiff, could hold that the plaintiff's case was insufficient as a matter of law. Unsurprisingly, the Supreme Court's decision reinstating the verdict was unanimous.

This case differs from *Reeves*, aside from the absence of proof of discriminatory animus, because there was only limited evidence in the present record that the employer's stated grounds for dismissal were false. *Cf. Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. Esteños claims that his English was, in fact, good enough, especially given the nature of his job, and that a genuine issue of material fact is presented in that regard. Leonard Supchak, the credit union's CEO, who does not speak Spanish, apparently told Esteños that he (Supchak) did not understand Esteños' limited English and could not communicate with him effectively. Even if we were to assume, *arguendo*, that Supchak's stated reason for Esteños' termination was pretextual, and that Supchak was concealing his true motive, there is simply no basis, on this record, for inferring that Supchak's real motive for firing Esteños, however unwarranted that motive might be, was that Esteños is from Peru. In other words, even if Esteños' English was better than Supchak claimed it to be, and even if it was sufficient to permit Esteños to do his job, one cannot reasonably infer from this alleged fact that Supchak fired Esteños because Esteños is of Peruvian national origin. Aside from the overwhelmingly Latino composition of the work force, a Peruvian–American was hired as a manager just ten days before Esteños' was discharged. In my opinion, even if Supchak is disbelieved, the notion that Esteños' Peruvian or Latino national origin played a role in the credit union's action is entirely without foundation.

I recognize that the presence of other Latinos, including that of a Peruvian–American manager, does not automatically require a finding that Esteños was not a victim of discrimination based on national origin. In *Reeves*, the Court reiterated this point, 530 U.S. at 153, 120 S.Ct. 2097, and I would not dispute it even if I were free to do so. But the statistical evidence in this case differs from that in *Reeves* in that almost all of the credit union's employees were of the same national origin as that which supposedly constituted the reason for Esteños' discharge.[6] Of the eight

6. In *Khiem v. United States*, 612 A.2d 160, 164 (D.C.1992), we explained:

> In *Kraft v. Kraft*, 155 A.2d 910 (D.C.1959), the court pointed out that:
> It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.
>
> 155 A.2d at 913. *See also Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944), where the Supreme Court stated:
> It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.*
> (Emphasis added in *Khiem*.)

There is nothing in *Reeves* to suggest that all or almost all of the employer's managers were roughly of the plaintiff's age, or that there were few or no younger managers. Without the persuasive evidence of age-based animus directed at the plaintiff in *Reeves*, the Court might well have viewed the inclusion of managers in their fifties in the employer's work force as persuasive evidence that the plaintiff

employees hired at or near the time that Esteños was fired, six (75%) were Latino, two (25%) were Asian, and not a single one was Anglo.[7] If Supchak was concealing some unknown malign motivation when he discharged Esteños for lack of proficiency in English, the remarkable statistics *in this case* demonstrate that Supchak's motivation surely was not based on Esteños' national origin.

## V.

Ultimately, the question on summary judgment is whether, viewing the record in the light most favorable to Esteños, an impartial trier of fact could rationally find that Esteños was fired because he is of Peruvian (or Latino) national origin. *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 199 (D.C.1991) ("the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed verdict") (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–53, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). I am at a loss to understand how an impartial juror could reasonably so find. Accordingly, I respectfully dissent from the reversal of the judgment in the credit union's favor.

was not discharged because of his age. Moreover, in the absence of the animus evidence, the jury might have reached a different verdict.

7. Ordinarily, discrimination against one class or group is intended to favor a different class or group. In this case, the favored group has not been identified by the plaintiff or by the majority, but there is surely no evidence in this case of a preference for Anglos.